IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| MATTHEW KOWALSKI, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | Civil Action No. 16-1707 |
| v. | ) ) | |
| MEGAN BRENNAN, Postmaster General, U.S. Postal Service, | ) ) ) ) | Chief United States Magistrate Judge Cynthia Reed Eddy |
| Defendant. | ) | |

**MEMORANDUM OPINION**

I. **INTRODUCTION**

Matthew Kowalski ("Plaintiff") sues Defendant Megan Brennan, in her capacity as the Postmaster General, U.S. Postal Service ("Defendant" or "Postal Service"), for wrongful termination. (ECF No. 1). In his Amended Complaint, Plaintiff advances claims under the Rehabilitation Act of 1973 and alleges that Defendant "discriminated against [him] because of his disability, and in retaliation for his protected activities." (ECF No. 15 ¶ 2). Presently pending before the court is Defendant's motion for summary judgment. (ECF No. 41). For the reasons that follow, the court will grant Defendant's motion.[1]

---

[1] Under the Federal Magistrate Judges Act, "[u]pon consent of the parties, a full-time United States magistrate judge . . . may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court." 28 U.S.C. § 636(c)(1). Consent of all parties to a case gives the magistrate judge full "authority over dispositive motions, conduct of trial, and entry of final judgment, all without district court review." *Roell v. Withrow*, 538 U.S. 580, 585 (2003). Both parties consented to the magistrate judge's jurisdiction. (ECF Nos. 14, 19).

## II. FACTUAL AND PROCEDURAL BACKGROUND

Unless otherwise stated, the following facts[2] are not in dispute. Plaintiff worked for the Postal Service as a part-time flexible letter carrier ("PTF"). (Defendant's Concise Statement of Material Facts ("D's CSMF"). ECF No. 43 ¶ 1). On January 12, 2011, after finding out that his normal route had been reassigned, Plaintiff spoke to his station manager David Meister and expressed feeling stressed out. (D's CSMF ¶ 2; ECF Nos. 44-1; 44-5 at 5; 48-1 at 4, 10). There is no dispute that during that conversation, Plaintiff referenced a high-profile shooting incident in Arizona. (D's CSMF ¶ 2; Plaintiff's Response to D's CSMF ("P's Res. D's CSMF") ECF No. 46 ¶ 2). Plaintiff doesn't deny making the reference to Tucson, Arizona, but denies it was a threat. (P's Res. D's CSMF at 2). Regardless, perceiving that reference to be a violation of the Postal Service's zero tolerance policy,[3] Meister told Plaintiff to leave immediately; he was placed on emergency placement in off-duty (without pay) status. (D's CSMF ¶ 3; P.'s Res. D's CSMF ¶ 2), (ECF No. 44-1 at 2). And the Postal Service instructed Plaintiff that he could not return to work without obtaining medical clearance "which indicates that you do not present a threat to yourself or others." (D's CSMF ¶ 3), (ECF No. 44-1 at 2).

---

[2] Plaintiff objects to our consideration of Defendant's Exhibits H through M (ECF No. 44-8–13) constitute impermissible hearsay. (ECF No. 46). This objection is overruled. "In this circuit, hearsay statements can be considered on a motion for summary judgment if they are capable of admission at trial." *FOP v. City of Camden*, 842 F.3d 231, 238 n.14 (3d Cir. 2016) (quoting *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 223 n.2 (3d Cir. 2000)). And here, Defendant has not only explained that the challenged exhibits are admissible under Federal Rule of Evidence 803(6)—i.e., the Records of a Regularly Conducted Activity exception—(ECF No. 54-3), but has also represented that the out-of-court-declarants are available to testify at trial. (ECF No. 54-4).

[3] The Defendant's "Pittsburgh Performance Cluster Violence in the Workplace Policy" includes a zero tolerance policy, mandating discipline for "any act of physical violence, ***any actual, implied or veiled threat made seriously or in jest***; openly hostile behavior to Management or Security/Inspection Service when they are intervening to stop offending behavior . . ." (ECF No. 44-4 at 3) (emphasis added).

Plaintiff was diagnosed with Generalized Anxiety Disorder ("GAD") and—upon receipt of medical documentation confirming that he was not a danger to himself or others—the Postal Service allowed him to return to work at the at the end of February 2011. (D's CSMF ¶ 4). In a letter dated February 23, 2011, Plaintiff's psychologist Dr. Robert McElhose said Plaintiff "has been successfully treated for anxiety" after four consultations, and recommended transferring him to a different location and restricting his hours to forty per week. (Plaintiff's Concise Statement of Material Facts ("P's CSMF"), ECF No. 47 ¶ 16). There is nothing in the record to indicate that Plaintiff continued to be treated by the psychologist after he returned to work.

Plaintiff failed to report for work on February 26, 2011, the next scheduled day of work, and was marked absent without leave ("AWOL"). This appears to have been the result of a miscommunication between the parties. Regardless, the Postal Service sought to terminate Plaintiff—based upon, inter alia, his January 12 reference to the Arizona shooting—and, in response, Plaintiff filed a grievance. (D's CSMF ¶¶ 8, 10). On March 2, 2011, a pre-disciplinary interview ("PDI") was conducted to afford Plaintiff the opportunity to explain his actions on January 12, 2011, his failure to return to work on February 26, 2011, and his answering "no comment" 15 times on his PDI questionnaire. (D's CSMF ¶ 6) ("P's CSMF at ¶ 28). There is no dispute that while that grievance was pending, Plaintiff was offered jobs at three different Postal Service locations; according to Plaintiff these were later rescinded because Plaintiff's union "took too long to complete the deal." (ECF No. 48-1 at 13). In his statement included in the EEO Inquiry Report and Informal EEO Complaint, Plaintiff admits he was offered other jobs at other locations, and in fact accepted one at another facility, but "[d]ue to the indifference of the Union, I was then told that . . . they took too long and that my offers were no longer on the table." ECF No. 44-14 at 10.

Maureen Gerst, who had replaced Meister as the station manager at the Greentree facility, then contacted Plaintiff and offered him to return under a Last Chance Agreement ("LCA"). (*Id.* at 10, 13). During that conversation Plaintiff expressed reservations about signing the LCA because he did not get along with one of his supervisors, Tony Piergrossi. (ECF No. 48-2 at 16–17). Plaintiff explained to Gerst that he needed to "walk away from situations" involving Piergrossi and, Gerst, allegedly, gave Plaintiff permission to "do whatever, basically, that [Plaintiff] needed to do, to not violate" the LCA. (*Id.* at 17). According to Plaintiff, he informed Piergrossi, Gerst and Trainer of his GAD, and requested permission from Gerst and Trainer to walk away from such confrontations, as an accommodation of his GAD. (P's CSMF ¶ 35). Defendant denies this. (ECF No. 49 at 9). The letter dated February 23, 2011 from Plaintiff's psychologist Dr. Robert McElhose makes no mention of Plaintiff's alleged need to walk away from situations.

In July 2011, the grievance was resolved once Plaintiff signed the LCA and agreed to adhere to all of the rules and regulations of the Postal Service, including the discharge of his duties and obedience to management's instructions and orders. (D's CSMF ¶¶ 10–12). The LCA remained in effect for two years from the date of signature. (D's CSMF ¶13). Pursuant to the terms of the LCA, Plaintiff agreed to adhere to the following rule, contained in Section 665.15, "[i]f an employee has reason to question the propriety of a supervisor's order, the individual must nevertheless carry out the order" and file a protest or pursue an appeal later. (*Id.* ¶ 14) (ECF No. 44-7 at 2). The LCA states that Plaintiff made the agreement with full understanding of the contents and was "made voluntarily without coercion or threats." (D's CSMF ¶ 15) (Ex. G). It further states that "[a]ll matters of agreement are specifically stated in this Last Chance Agreement." (ECF No. 44-7 at 3).

Plaintiff asserts that upon his return under the LCA, Piergrossi threatened him with termination and criticized him on a daily basis. (P's CSMF ¶ 37). According to Plaintiff, Piergrossi knew about Plaintiff's GAD diagnosis, and tried to trigger Plaintiff's anxiety—by using abusive language and getting in Plaintiff's face—to get him to violate the LCA. (*Id.* ¶¶ 35, 39, 41, 42). And, at least on one occasion, upon observing that Plaintiff was "not working and just sitting around in the office," Piergrossi told Plaintiff that he would not get paid for that time and altered Plaintiff's time entry. (*Id.* ¶ 44; ECF No. 48-12 at 6). Plaintiff also claims that Piergrossi mocked his GAD by calling him disparaging names—such as, Killer Kowaski, nuts, crazy—and by telling Plaintiff's co-workers that they should wear a bullet proof vest around Plaintiff because he might go "postal"—i.e., lose it. (P's CSMF ¶¶ 40, 43). At no time up through his removal on December 27, 2011 did Plaintiff ever seek EEO counseling or file an EEO complaint for these allegations. Additionally, Plaintiff avers that, after assigning him the most physically demanding routes, Piergrossi would not only refuse to provide Plaintiff with sufficient time to complete his work, but would also threaten to fire Plaintiff if he was not back on time.[4] (*Id.* ¶ 50). None of these allegations were timely raised or exhausted through the EEO process or union grievance.

On October 7, 2011 Plaintiff was absent from work after being denied leave for the holiday weekend, and on October 11, 2011, he walked out at 9:30 a.m. stating he was not well enough to

---

[4] Plaintiff was diagnosed with osteoarthritis on October 31, 2011. (P's CSMF ¶ 47). Plaintiff asserts that Piergrossi intentionally sought to exacerbate his osteoarthritis by removing him from his route assignment almost every day, and reassigning him to heavier and more strenuous loads. (*Id.* ¶ 48). But the evidence that Plaintiff cites in support of this assertion reflects that—when Plaintiff had a hold down on Route 23—Piergrossi re-assigned him to a different route on a daily basis instead of equitably rotating the re-assignments among all PTFs. (ECF Nos. 48-17 at 6; 48-6 ¶¶ 9–12). And Plaintiff admitted that he was not allowed to take a hold down on a route after he was placed on "light duty." (ECF 48-1 at 19). Therefore, the court finds that Plaintiff's assertion—i.e., the route re-assignments were intended to exacerbate his osteoarthritis—is not supported by the record.

5

work, and was not authorized to leave. He became argumentative, combative and abandoned his position. (ECF No. 44-9 at 4). He was charged with absent without leave ("AWOL") by management. No formal action was taken at that time. (ECF NO. 50-4 at 5). He later obtained documentation from the Med Express in Greentree which reflects he was seen on October 11, 2011 complaining of knee pain, and that the date of the injury was October 9, 2011. (ECF NO. 48-4 at 2). He was not currently taking any medications and was prescribed a knee brace and given Vicodin for pain and Medrol. (ECF No. 48-4 at 4). The doctor diagnosed osteoarthritis and recommended modified duty with restrictions of no bending, stooping, or kneeling and limited hours of standing, sitting and walking for an indeterminate date to return to full duty. (ECF No.48-4 at 2).

On December 27, 2011, Piergrossi assigned Plaintiff to a specific route. (D's CSMF ¶ 22). At the time, Plaintiff was on "light duty" due to his osteoarthritis and Piergrossi told Plaintiff that the assigned route was within Plaintiff's "light duty" restrictions. (P's CSMF ¶ 47; ECF Nos. 48-1 at 19; 44-10 at 2). Piergrossi believed the route, which included driving deliveries, was appropriate given Plaintiff's knee problems. (ECF No. 48-12 at 7). Believing that route assignment to be in direct violation of the collective bargaining agreement, Plaintiff requested to talk a union representative. (P's CSMF ¶ 56). Management is not obligated to contact the union when making such an assignment. (ECF No. 44-13 at 3). Plaintiff claims that, in response to his request, Piergrossi started shouting profanities and threatened Plaintiff with termination by stating that failure to deliver mail to the assigned route would be a direct violation of the LCA. (*Id.* ¶¶ 57, 58, 64). Plaintiff became argumentative and refused to perform the assignment. (ECF No. 44-12 at 2). At some point, Piergrossi and Plaintiff spoke to a union steward, Jerry Devlin, who advised Plaintiff to proceed as instructed and file a grievance later. (D's CSMF ¶ 25). Plaintiff claims that

this exchange triggered the onset of a "panic attack" prompting him to request emergency sick leave which Piergrossi rejected. (P's CSMF ¶¶ 62, 65, 66; ECF No. 44-11 at 2). According to Plaintiff, Piegrossi ripped the sick leave slip out of Plainitff's hand, threw it in the garbage can, and told Plaintiff to "just get the hell out" because Piergrossi was "going to have [him] fired," and Plaintiff left. (P's CSMF ¶¶ 66, 67).

The Postal Service placed Plaintiff on emergency leave the next day. (D's CSMF ¶ 28; P's CSMF ¶ 69). Plaintiff tried to resolve the matter by contacting David Trainer, who had replaced Gerst as the station manager, but Trainer told Plaintiff that he was pursing a termination. (ECF No. 48-1 at 4, 26). On February 6, 2012, Trainer issued a removal notice proposing Plaintiff's termination because he violated the LCA by, inter alia, failing to follow Piergrossi's instructions and deliver mail to the assigned route. (D's CSMF ¶ 30, ECF No. 44-13 at 3). Plaintiff grieved the proposed removal but the decision to terminate him was upheld on March 28, 2012. (D's CSMF ¶¶ 31, 32).

In a declaration signed by one of Plaintiff's co-workers, Michael Schuler, Schuler stated that Piergrossi had "interpersonal problems with many employees at the Greentree location while he was supervisor there. He was frequently rude, insulting or gruff with letter carriers." (ECF No. 48-6 at 2). However, Schuler believed Piergrossi mistreated Plaintiff more aggressively than any other employees at the Greentree location. (ECF No. 48-6 at 3). Piergrossi was described as "a power trip supervisor" who would "get irritated with any union discussion" and "not a good supervisor when it came to having any respect for workers." (ECF No. 48-16 at 5, 6). Some thought he treated Plaintiff poorly on a daily basis, although "[e]very day it seemed to be someone else." (ECF No. 48-16 at 6).

In a statement given in connection with the grievance, David Trainer wrote:

7

> On the date in question, letter carrier Matt Kowalski was given his assignments by Mgmt. Mr. Kowalski became argumentative with the supervisor and was refusing to perform his assignment. Mr. Kowalski was brought into the office with union steward Jerry Devlin and his own union advised him to accept and complete his assignment and how to go about arguing his case the correct way. Mr. Kowalski chose not to heed this advice and still refused his assignment. While he stated that he was being "pushed" into his actions and behavior by the supervisor, none of this occurred and Steward Devlin, being present, did not see this. This is not the first time this employee has reacted in such a manner as he was already on a last chance agreement for this. Additionally he violated this last chance agreement in Oct 2011 of which management did not take disciplinary action for but instead gave the employee an opportunity to correct his behavior. By simply always stating sick leave when he disagrees or does not "like" his assignment for the day on each of these occasions, the employee has demonstrated that he does not have a willingness to want to perform his duties and follow instructions as required by his position.

(ECF NO. 44-12 at 2-3).

On April 18, 2012, Plaintiff contacted an Equal Employment Opportunity ("EEO") counselor and, after exhausting his administrative remedies, initiated this action by filing a six-count complaint on November 11, 2016, alleging violations of the Americans with Disability Act[5] ("ADA") and the Rehabilitation Act of 1973[6] ("RA") (D's CSMF ¶¶ 34, 44; ECF No. 1). On April 12, 2017, Defendant moved for dismissal[7] prompting Plaintiff to file a two-count Amended Complaint—alleging discrimination and retaliation in violation of the RA—on May 4, 2017. (ECF Nos. 10, 15). On June 28, 2018, after the completion of discovery, Defendant filed the pending motion for summary judgment, a supporting brief, D's CSMF, and an appendix. (ECF Nos. 41, 42, 43, 44). Plaintiff responded with a brief in opposition, P's Res. D's CSMF, P's CSMF, and an appendix on August 13, 2018. (ECF No. 45, 46, 47, 48). Defendant then filed a response to P's CSMF and a supplement to the appendix on August 27, 2018. (ECF Nos. 49, 50). On March 4,

---

[5] 42 U.S.C. § 12101 *et seq.*
[6] 29 U.S.C. § 701 *et seq.*
[7] Defendant argued, inter alia, that claims under the ADA were prohibited because the RA is the exclusive means by which federal employees may raise a claim for disability discrimination, citing *Spence v. Straw*, 54 F.3d 196 (3d Cir. 1995) (ECF No. 11 at 7-8).

8

2019, following instruction by the court, Defendant filed a reply brief to which Plaintiff responded with a sur-reply brief on March 13, 2019. (ECF Nos. 54, 57).

As the present motion for summary judgment has been fully briefed, it is now ripe for disposition. The court's analysis follows.

### III. STANDARD OF REVIEW

Summary judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact is one that could affect the outcome of litigation. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *N.A.A.C.P. v. North Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue, in rebuttal. *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587). When considering the parties' arguments, the court is required to view all facts and draw all inferences in the light most favorable to the non-moving party. *Id.* (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). The benefit of the doubt will be given to allegations of the non-moving party when in conflict with the moving party's claims. *Bialko v. Quaker Oats Co.*, 434 F.

App'x 139, 141 n.4 (3d Cir. 2011) (citing *Valhal Corp. v. Sullivan Assocs.*, 44 F.3d 195, 200 (3d Cir. 1995)).

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits, depositions, admissions, and/or interrogatories to demonstrate the existence of a genuine issue. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (citing *Celotex Corp.*, 477 U.S. at 324).

## IV. DISCUSSION

Section 504 of the RA states, in relevant part:

> No otherwise qualified individual with a disability in the United States, . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination . . . under any program or activity conducted by . . . the United States Postal Service.

29 U.S.C. § 794(a)

The United States Court of Appeals for the Third Circuit has explained that "[t]he substantive standards for determining liability under the [RA] and the ADA are the same." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 275 (3d Cir. 2014) (quoting *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 282–83 (3d Cir. 2012)); *see* 29 U.S.C. § 794(d). Two of those substantive standards are implicated in this case. First, "the ADA prohibits covered employers from discriminating against qualified individuals with disabilities because of their disabilities, a prohibition that includes failing to reasonably accommodate such individuals." *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 191 (3d Cir. 2009) (citing 42 U.S.C. § 12112(a), (b)(5)). Second, the ADA prohibits retaliatory discrimination. 42 U.S.C. § 12203(a).

Plaintiff claims that the Postal Service "discriminated against [him] because of his disability, and in retaliation for his protected activities." (ECF No. 15 ¶ 2). The Postal Service contends that it is entitled to summary judgment on both procedural and substantive grounds. (ECF No. 42). Procedurally, the Postal Service argues for dismissal because Plaintiff failed to exhaust his administrative remedies as to certain discrete acts. (*Id.* at 8). Substantively, the Postal Service contends Plaintiff has failed to establish a prima facie case of either discrimination or retaliation. (*Id.* at 5). And even if Plaintiff had established a prima facie case, argues the Postal Service, it has proffered sufficient evidence of a legitimate non-discriminatory reason for firing him, i.e, violation of the LCA, and he has failed to demonstrate that this reason for firing him was pretextual. (*Id.* at 5). The court will discuss the Postal Service's procedural and substantive arguments, in turn.

A. **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

It is well established that "[a] federal employee seeking relief under the [RA] must exhaust administrative remedies prior to filing suit." *Campbell v. United States*, 375 F. App'x 254, 258 (3d Cir. 2010) (citing *Freed v. Consol. Rail Corp.*, 201 F.3d 188, 192 (3d Cir. 2000); *Spence v. Straw*, 54 F.3d 196, 200 (3d Cir. 1995)). The administrative exhaustion process, implicated in this case, requires an employee to contact an EEO counselor "within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1). In determining whether a claim is timely, there is a distinction between discrete acts of discrimination[8] and a hostile work environment claim.[9] And, the United

---

[8] Discrete acts include: "termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, wrongful accusation." *O'Connor*, 440 F.3d at 127.

[9] A hostile work environment is one that is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Clarkson v. SEPTA*, 700 F. App'x 111, 115–16 (3d Cir. 2017) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).

11

States Court of Appeals for the Third Circuit has explained that discrete acts of discrimination "must be raised within the applicable limitations period or they will not support a lawsuit," while a hostile work environment claim "can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period." *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006).

Here, the following three facts are undisputed. First, Plaintiff was put on emergency leave after the December 27, 2011 incident and did not return to work afterwards. Second, the Postal Service issued a notice of removal proposing Plaintiff's termination on February 6, 2012, which was upheld on March 28, 2012. And finally, Plaintiff contacted an EEO counselor on April 18, 2012. But, in his amended complaint, Plaintiff alleges various discrete acts of discrimination along with—what the court construes as—a hostile work environment claim spanning from January 2011 through December 27, 2011. (*See generally* ECF No. 15). The Postal Service asserts that the latest it could have subjected Plaintiff either to a discrete act of discrimination or to a hostile work environment was December 27, 2011—i.e., the last day that Plaintiff worked. (ECF No. 42 at 8, 12). Therefore, the Postal Service correctly argues, in order to timely exhaust his administrative remedies Plaintiff had to initiate contact with an EEO counselor within 45 days from December 27, 2011. (*Id.*). And, because Plaintiff did not contact an EEO counselor until April 18, 2012, any claims arising out of conduct that occurred between January 2011 through December 27, 2011, are untimely. (*Id.*).

In response, Plaintiff concedes that he is not asserting claims for discrete acts of discrimination occurring between January 2011 and December 27, 2011, but utterly fails to address any potential hostile work environment claim, let alone make a meaningful effort to link it to discriminatory treatment taking place within the relevant 45-day window. (ECF No. 45 at 18). And

a hostile work environment claim is time-barred where, as here, the date of the last alleged incident of harassment falls outside the limitations period for filing a timely charge. *Mercer v. SEPTA*, 608 F. App'x 60, 63–64 (3d Cir. 2015). Accordingly, the court finds that summary judgment is appropriate on all of Plaintiff's claims arising out of conduct which occurred more than 45 days prior to April 18, 2012. This includes the January 12, 2011 emergency placement in off duty status, the designation of him as being AWOL on February 26, 2011 and the October 11, 2011 incident when he walked off the job due to knee pain. The only claims that Plaintiff timely exhausted, therefore, are his retaliation claim and his allegedly wrongful termination which became effective—at the end of the grievance procedure—on March 28, 2012.

**B. WRONGFUL TERMINATION**

"The Rehabilitation Act forbids employers from discriminating against persons with disabilities in matters of hiring, placement, or advancement." *Shiring v. Runyon*, 90 F.3d 827, 830–31 (3d Cir. 1996). However, "Congress recognizes that '[e]mployers cannot be obligated to employ persons who are incapable of performing the necessary duties of the job.'" *Id.* at 831. "The Rehabilitation Act expressly makes the standards set forth in the 1990 Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. applicable to federal employers and to employers receiving federal funding." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007) (citing 29 U.S.C. § 791). Accordingly, the burden-shifting analysis set forth in *McDonnell Douglas*, 411 U.S. 792 (1973) applies to discrimination actions brought under the Rehabilitation Act. *Id.* at 185.[10] Under this

---

[10] Plaintiff asserts that—because he offered direct evidence of discrimination—the case should be analyzed under "mixed-motives" theory articulated in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). (ECF No. 45 at 11–12). It is well established that evidence of discrimination qualifies as direct when "it demonstrates that the decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Walden v. Georgia–Pacific Corp.*, 126 F.3d 506, 512–13 (3d Cir.1997) (quoting *Price Waterhouse*, 490 U.S. at 277). On the record before this

13

framework, a plaintiff bears the burden to prove a prima facie discrimination case by establishing that he (1) has a disability, (2) is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations b the employer, and (3) was nonetheless terminated or otherwise prevented from performing the job. *Shiring*, 90 F.3d at 831. If a plaintiff meets that burden, the defendant then bears the burden to produce a legitimate, non-discriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. And the burden then shifts back to the plaintiff to demonstrate that the defendant's purported reason was really pretext for discrimination. *Id.* at 804. Plaintiff can demonstrate pretext "by *either* (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

In moving for summary judgment, the Postal Service takes the position that Plaintiff has not met his burden of proof on the third element of a prima facie case of discrimination—i.e., he failed to establish that he was terminated because of his alleged disability. (ECF No. 42 at 5).[11] Regardless, in its brief in support of the motion for summary judgment the Postal Service assumes *arguendo* that Plaintiff has met his initial burden and has raised an inference of discrimination,

---

court, Plaintiff's evidence does not meet that standard. Accordingly, the court will analyze Plaintiff's claims under *McDonnell Douglas* framework.

[11] The Rehabilitation Act defines an "individual with a disability" as "an individual who (1) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) has a record of such an impairment, or (3) is regarded as having such an impairment." *Id.* (citing 29 U.S.C. § 705(20)(B)). Defendant does not challenge that Plaintiff has met the prima facie case, and we therefore do not address the issue of whether Plaintiff is disabled under the statute, although we have doubts as to its viability. *See Logan v. Potter*, 2007 WL 1652268 (D. N.J. June 6, 2007) (granting summary judgment in favor of Defendant Postmaster General in an RA case on the grounds that no reasonable juror could conclude Plaintiff's GAD substantially limited the major life activity of working when he was still able to work in a broad class of jobs even though he could no longer work in a particular location); *see also Kiser v. Potter*, 2012 WL 1134810, *7 (W.D. Pa. April 4, 2012) and cases cited therein ("Courts routinely dismiss disability claims premised on work-related stress conditions which are temporary in nature"), *and Bialko v. Quaker Oats Co.*, 434 Fed. App'x 139, 142 (3d Cir. June 22, 2011) and cases cited therein (claimed inability to work overtime does not constitute a substantial limitation on the ability to work because it leaves a person qualified for a broad range of jobs).

and thereafter focuses its attention on its burden of production to rebut the presumption of discrimination through introduction of evidence that the challenged employment action was taken for legitimate non-discriminatory reasons. In this instance, the proffered reason for the termination was Plaintiff violated the LCA.

The burden at this stage of the *McDonnell Douglas* framework is "relatively light" and the employer need only introduce evidence which "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes*, 32 F.3d at 763. The Postal Service maintains that it terminated Plaintiff because he violated the LCA. (ECF No. 42 at 5). As set forth supra, the evidence of record supports the notion that the LCA was violated because plaintiff was insubordinate, failed to follow a superior's directive, argued with his supervisor and walked off the job and thereby abandoned his route. The terms of the Last Chance Agreement provided that Plaintiff must obey instructions of his supervisors, and if he disagreed with the order, he must carry out the order and may file a protest in writing to the official in charge or appeal it through official channels. The union representative, Jerry Devlin, advised plaintiff to follow the instructions of his supervisor, and to grieve the matter later. David Trainer, the station manager, issued a removal notice on February 6, 2012, proposing Plaintiff's termination because he violated the LCA by failing to follow Piergrossi's instructions and deliver mail to the assigned route. (ECF No. 44-13 at 3). Failure to follow a superior's directive and insubordination is a legitimate, non-discriminatory reason for an employee's termination. *See Harris v. Vitran Express*, 2016 WL 1255296 *7 (March 31, 2016) and cases cited therein. Accordingly, the Postal Service has met its burden in this regard.

Next, in order to defeat the motion for summary judgment, Plaintiff must demonstrate that the Postal Service's purported reason was really pretext for discrimination. He also responds by

disputing that he engaged in conduct that violated the LCA. (ECF No. 45 at 17). To survive summary judgment when the employer has articulated a legitimate, non-discriminatory reason for its action, the plaintiff must point to some evidence...from which a fact-finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely or not a motivating or determining cause of the employer's action." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639, 644 (3d Cir. 1998) (quoting *Fuentes,* 32 F.3d at 764). To make the employer's stated reason for termination suspect, the employee

> need not "produce evidence that necessarily leads to the conclusion that the employer acted for discriminatory reasons, nor produce additional evidence beyond [his] prima facie case." *Id.* (citations omitted). The plaintiff must, however, point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the proffered nondiscriminatory reason did not actually motivate the employer's action."

*Simpson,* 142 F.3d at 644 (quoting *Fuentes*, 32 F.3d at 764-65).

To the extent Plaintiff claims the Postal Service failed to accommodate his disabilities we note the following. Although the letter from his treating psychologist recommends the be limited to a 40 hour work week, based on our review of the record and briefs, Plaintiff does not appear to be pursuing this line of accommodation in his briefing. As for his need to be transferred to a different location, he was offered jobs at other facilities but Plaintiff blames the union, as opposed to discriminatory animus, for not making this happen. [12] To the extent Plaintiff argues that his GAD should have been accommodated by the Postal Service in the form of permitting him to walk

---

[12] Regardless, this claim is untimely. Plaintiff confusingly appears to concede that he is not pursuing claims for discrete acts of discrimination occurring between January 2011 and December 27, 2011. (*Id.* at 20). Denial of a reasonable accommodation is a discrete event because "[a] reasonable accommodation request is a one-time occurrence . . . ." *Mercer v. SEPTA*, 608 F. App'x 60, 63 (3d Cir. 2015).

away from stressful situations, the only record evidence to support that the Postal Service was told of this alleged accommodation is plaintiff's self-serving deposition. Even if Plaintiff believed he should be allowed to leave his position due to stress, there is nothing in the record to substantiate that Piergrossi should have permitted Plaintiff to submit a sick leave slip and abandon his position. He denies knowing anything about such an alleged necessity. "An employer discriminates against a qualified individual with a disability when the employer does not make reasonable accommodations to the ***known*** physical or mental limitations of the individual...." *Taylor v. Phoenixville Sch. Dist*., 184 F.3d 296, 306 (3d Cir. 1999)(emphasis added). Plaintiff appears to have been under the impression that the prior station manager, Maureen Gerst, knew he needed to walk away from situations involving Piergrossi, he testified that she would have permitted him to "do whatever, basically, that [Plaintiff] needed to do, to not violate" the LCA. The record evidence establishes that LCA required him to carry out any orders he questioned and file a protest through the grievance procedure. He further testified that Gerst told him he "could do whatever y psychologist said would be in my best interest to get through this together." Yet the psychologist's letter, provided to the Postal Service as proof he had GAD but could return to the job without being a danger to himself or others, does not mention it. And permitting the accommodation requested, in the form of emergency medical leave to abandon his position, would no doubt cause an undue hardship to the employer. *Shirling*, 90 F.3d 827, 831 (3d Cir. 1996).

Moreover, the prior comments made by Piergrossi, relating to plaintiff being "nuts", or calling him disparaging names such as "Killer Kowawalski" (which Piergrossi denies, but we nevertheless assume happened in viewing the facts in favor of the non-movant) clearly show, minimally, his poor management skills; it is however undisputed he treated all employees in a disparaging fashion. Even so there is no dispute that at the time of the argument on December 27,

2011, Piergrossi was correct in reminding plaintiff that by the clear terms of the LCA, to which he agreed in order to keep his job, he would violate the LCA if he abandoned his job and defied his orders. No discriminatory animus can be attributed to Mr. Trainer, the individual who *issued* Plaintiff's notice of removal, or, indeed, Jim Diulus, the concurrent official. Both cited Plaintiff's history of insubordination, AWOL incident(s), the clear terms of the LCA, and failure to follow directives. Plaintiff has not shown that a fact-finder could reasonably disbelieve the articulated legitimate reason for his termination, or that an invidious discriminatory reason was more likely or not a motivating or determining cause for his firing.

Accordingly, the court finds that Plaintiff has failed to show that the Postal Service's articulated legitimate reason for firing him was pretextual. He has failed to show a genuine dispute of material fact that he was discriminated against on the basis of his disability when he was terminated.

### C. Retaliation Claim

Next, we address Plaintiffs retaliation claim. To establish a prima facie case of retaliation under the Rehabilitation Act, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. If an employee establishes a prima facie case the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action. If the employer satisfies its burden, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action. *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–501 (3d Cir.1997); *see also Ozlek v. Potter*, 259 Fed. Appx. 417, 421–422 (3d Cir. 2007).

Assuming that the Plaintiff has met his initial burden, which is to say, that request to complete a form requesting emergency leave of absence was a protected employee activity, that his termination was an adverse action, *Jones v. SE. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015), and further, that there was a causal connection between the engagement of that protected activity and an adverse employment action, under the *McDonnelll-Douglas* framework, which applies to the retaliation claim, the burden shifts to the Postal Service to articulate some legitimate, non-discriminatory reason for Plaintiff's termination. *Wishkin v. Potter*, 476 F.3d180, 184–85 (3d Cir. 2007). As discussed in more detail *supra,* the Postal Service has articulated a legitimate, non-discriminatory reason for the adverse action, and even in the light most favorable to Plaintiff, there is insufficient evidence that would lead a reasonable fact finder to conclude that its stated reason for Plaintiff's termination was pretextual. Accordingly, Plaintiff's claim of retaliation under the RA will not survive summary judgment.

## V. CONCLUSION

Based upon the foregoing, the court will GRANT Defendant's motion for summary judgment. An appropriate order follows.

Date: March 28, 2019

*/s/ Cynthia Reed Eddy*
Cynthia Reed Eddy
Chief United States Magistrate Judge

Cc: record counsel